All rise. Please be seated. Good afternoon, ladies and gentlemen. The last case on today's docket is People of the State of Illinois v. Judah Watkins. We have Mr. Paul Christensen for the appellant, and we have Ms. Rebecca McCormick for the appellee. May it please the court, your honors, counsel, I am Paul Christensen. I'm a criminal trial lawyer from Murfreesboro. I've practiced 26 years in that business, and I have hundreds of jury trials to my experience. I was proud to be hired and retained to represent the defendant appellant in this case, Judah Watkins, at the post-conviction stage. I had nothing to do with this case prior to that. However, we did have the transcripts of the trial. We did have lots of information, although I was not privileged to have the original police reports. We appealed Judah Watkins' 50-year sentence, his conviction for first-degree murder out of Massack County. We're at the post-conviction stage, and we've alleged constitutional violations and denial of the Sixth Amendment rights to effective counsel, both at the trial level and at the appellate level. Judah Watkins, at the time this case occurred, the incident and the murder or the death of the victim was in May of 2004, approximately six years ago. Since that time, Judah Watkins has been incarcerated. His life is at stake today, your honors, and I hope the muse will strike me so that I can give you what needs to be done. In my 26 years of experience, I have never had a case like this where I cried out for a real lawyer to say something about what happened. And your honors, I know that one of you is familiar with these facts, and two of you probably are not. I'm going to tell you what the facts are. My client was 17 years old in high school. He was an honor student and an excellent basketball player. He had opportunities to go to college on scholarships playing basketball. He was a young black man, a bright guy, a gentle person, and I contend that he's an innocent person today as he was at the time of the crime. Judah Watkins deserves a fair hearing by this court, and I ask you to take this matter to your heart as I have to mine. This is a case that needs our help. The facts of the case are this. A beautiful 22-year-old Andrea Perdue lost her life on May 26, 2004. She was a white person. She was living with Wes Edwards, another white person, in a trailer out in a rural area in Nassau County outside of Metropolis. Wes Edwards was a marijuana dealer. He sold dope, and Judah Watkins came in contact with him in this fashion. Judah had spent a few days away from his family, staying with his cousin, Joel Nelson. Joel Nelson, as a black person, had white girlfriends. He was staying with two different girlfriends, each of them having his child. The most important one in this case was Christy McCormick, who had a two-year-old child, Brennan McCormick, from Joel Nelson. It turns out that Christy McCormick is a witness against Judah Watkins, and Joel Nelson and Christy McCormick were intimately involved in what happened here. Now, the other co-defendant in this case was a guy named Sherrod Roundtree. Sherrod was 25, Judah was 17. On the night in question, about 12.30 a.m., Joel Nelson was at McCormick's apartment, where he arrived there at 12.30 in the morning with Judah Watkins and Sherrod Roundtree. Judah knew Sherrod, but only for a couple months. Sherrod Roundtree had been around quite a while with Joel Nelson, who dealt in guns and dope. They planned, meaning they, Nelson and Roundtree and McCormick, planned to rob West Edwards. Judah Watkins was downstairs, they went upstairs. Without Judah, Judah was left out of the game, except that he was to go along to purchase the marijuana. What about the testimony of Christy McCormick, where she says that Judah was going through drawers in the kitchen looking for a latex glove and had a handgun? Correct. Christy McCormick became the state's evidence after she was part of this crime and decided to testify to these matters. We believe this was a coordinated effort by the state, who had an expert trial lawyer coming from the AG's office, Edward Parkinson. They outnumbered them. They had Edward Parkinson, Joe Jackson, who's now the judge in Massachusetts County, and Patrick Winhorse, who's now the state's attorney there. They had three good trial lawyers on one side, and they had 21 witnesses for the state, of which Christy McCormick was one of the primary ones. She was never charged in this case. She had a motive to testify falsely, and we believe there was no latex glove ever found or discussed other than her testimony. She never mentioned it to police until just a few days before the trial. This was not in any of the police reports. So that latex glove was a made-up, backed-in piece of evidence that the state needed to convict this young man. That's what Christy McCormick was about. She was accessory before the fact. She took them upstairs and got a 9mm handgun out of the closet upstairs, and they gave it to Sherrod Roundtree in a diaper bag along with a roll of duct tape and perhaps another 9mm. We're not quite sure about that. It's the ballistics evidence in this case that's absolutely critical. But Christy McCormick is not a believable witness because she was trying to protect herself, Joel Nelson, and her child, which she says so clearly in her testimony. Christy McCormick was a state's witness, but she's not a believable witness. And when asked whether she saw another handgun, Your Honor, she said, who had the handgun, I believe it was Judith. Now that's how adamant she was in her testimony. So I would answer that question saying Christy McCormick's not a believable person. She had a motive to testify falsely, and she did testify falsely in order to save her own behind. And that's what we believe has happened in this case. Same goes for Sherrod Roundtree. Sherrod Roundtree is the co-defendant. Now the co-defendant in this case copped a deal with the state. He got 20 years. He pled guilty. He got the minimum sentence for murder instead of the 50 he ought to be carrying because later on he wrote an affidavit, which is in the record that I'm going to read to you, that exonerates Judah Watkins completely. And he tells the truth in his affidavit after he's in prison. The truth is that Judah Watkins went out with Sherrod Roundtree, who had been to Wes Edwards' trailer previously. My client had never been there. He was out in the countryside driving around. Sherrod Roundtree knew where to go because he'd been there before. He'd been there for a cave party, and he'd been there to buy marijuana. So Wes Edwards' trailer was familiar to him. The co-defendant's testimony at trial, there's Chrissy McCormick for the state and there's Sherrod Roundtree for the state. Sherrod Roundtree said this, that they went there, Judah kicked in the door, ran to the back of the trailer, and shot the person three times before Roundtree was just sitting there. Well, that doesn't fit with anything because he didn't know where in the trailer the layout was. Roundtree did. Now, in the affidavit, Roundtree says this, and I will read that as part of the record. We called him to testify to this. He refused to testify after he was threatened with perjury. So he wouldn't testify after this. But this is what he said in the affidavit that he signed when he was in the joint and before a notary public. And they all agreed that this was indeed his signature and this was indeed his affidavit. And this is what he said. That on or about the morning of the 3rd, I testified for the prosecution in the case against Judah Watkins. That the testimony I provided was inculpatory and I falsely implicated Judah Watkins in a crime I planned to commit alone on May 25th at Wes Edwards' home. That prior to testifying for the prosecution, I was coerced into involving Judah Watkins by my then-attorney, Tim Kapsch, who facilitated my actions. That on the night I committed the crime, I asked Judah to ride with me to buy some marijuana from my guy Wes. Judah agreed to ride with me, but he did not know my intentions were to rob Wes. That prior to seeing Judah that night, I had consumed a lot of liquor and marijuana. That was during this time I was intoxicated. I planned to rob Wes. That at no time before or during our ride did I ever mention my plan to Judah. That from the very beginning of our conversation and ride, I led Judah to believe I was only going to Wes' house to purchase marijuana from him. That Judah never had a gun on his person while riding with me. That Judah never knew Wes prior to May 25th, nor did he know the area where his home was located. After we arrived at Wes' home, Judah was still not aware of my intentions. Judah did not know I was armed with a 9mm handgun. That after we approached the entrance, I kicked in the front door, ran into the back of the bedroom, where I struggled with Wes and his girlfriend, Andrea. That during the struggle, I panicked and shot Andrea. I then shot Wes in an attempt to make him tell me where he kept all of his money and marijuana hidden. That during the course of the crime, Judah never participated in the robbery or murder of Andrea Perdue. That soon after Judah realized what was happening, he immediately ran back to the car. That while awaiting trial in jail, preparing for my defense, I was told that in order to escape the maximum sentence, I would be required to plead guilty and testify against Judah. That I was coerced at this point to involve Judah in this crime. I testified against Judah at trial, but the testimony I provided was false. That my trial attorney told me to accept the prosecution's offer of leniency and save myself in the maximum sentence in this case. Thus, I assert that Judah Weitzman's had nothing to do with this crime he's since convicted of. He is totally innocent and is incarcerated for a crime he was not involved with. Now, that's the truth, your honor, out of this man's mouth after he got the 20-year sentence. But, there's a lot more to this case. And our basis is the failure of the ineffective assistance of counsel that he received from a Mary Lou Shainer. Mary Lou Shainer, it was a second choice. Anthony Lloyd, a public defender in Massachusetts County, was appointed. He withdrew two days later. Mary Lou Shainer was then appointed. Six months later, it went to trial. During this time, Mary Lou Shainer failed in her pretrial negotiations. Why? Judah Weitzman cooperated with the police from the beginning. Judah Weitzman told them exactly what had happened. He told them where they went. Judah Weitzman showed them where Sherrod had dropped the handgun. After they ran out and got in the car, Sherrod was driving. And they had a wreck. The airbags deployed. And Joel Nelson's wife, Chrysler, was left at the crime scene. So they had DNA evidence off of the deployed airbags. They had everything to confirm that both of those people were there. Joel Nelson's car was left there. Sherrod and Judah walked back to where they went, back to Joel Nelson's house, and tried to get them to open the door. But they wouldn't open the door. Why? Because Sherrod Browntree had stolen one of Wes Peckridge's cell phones. He called Joel Nelson and told him, hey, things screwed up here. We are, you know, told about what happened. So Joel Nelson then realized that he's implicated, and what does he do? He calls Wes Edwards' house. Wes Edwards' testimony in trial said he picked up the phone, and there was Joel Nelson on the other end. Joel Nelson confirms that he called that night to Wes Edwards. Wes Edwards told him that he was dying and gasping he had been shot. At this time, Joel Nelson has his McCormick person drive him to the other baby's mama's house, Katrika Hardy's house, and asked Katrika Hardy to call 911. So it was Joel Nelson, Katrika Hardy that reported this crime to begin with. They went out there because they were concerned that somebody was hurt. When the deputy arrived there at 2 something in the morning, the first guy on the scene was a guy named Ronald Faberge, deputy sheriff of Maxton County. And why his testimony is important is that on page 271 of the record, you will see where he says this. He went into the kitchen. There was no one in the kitchen, but there was a Luger MIG-14 rifle laying on the kitchen table. Record C-271. And what's important about that is the word Luger. Luger comes from the German gun named a Luger developed by the Germans. It has a 9mm classic cartridge called a Luger cartridge. That's what a 9mm is. Luger is synonymous with 9mm. And Deputy Traversy first figures the MIG-14 rifle as a Luger MIG-14. Now, it turns out that this rifle was ignored basically during the trial and probably pre-trial. Why? Because it was a rifle. It wasn't a handgun. They found projectiles in the person's body that was killed. Three of them. They had six lengths and grooves with a right-hand twist, 9mm projectile. The specifications for a MIG-14 9mm rifle are six lengths and grooves, right-hand twist, exactly the characteristics of the bullets where they were looking for the mystery gun. I do not believe that this gun was examined by experts for the defense. And that's part of our allegations of ineffective assistance counsel against Mary Lou Shaner. Let's talk about that. Let's talk about that MIG-14 rifle because you referenced something outside the record, which you claim you could do because it was post-conviction, that this 9mm MIG-14 could have been the weapon, and that was Wes Edwards' rifle. Correct. I went on that website, and a 9mm MIG-14 has never been manufactured and no conversion kits. So the attorney, if she had gone into that, it would have collapsed. I don't want any evidence. I don't want any record. If it's in the record, make reference to it. Your Honor, I ask the record to reflect that the computer site for Ruger shows a MIG-14 rifle, 9mm caliber, six lengths and grooves, right-hand twist. We have this information off of the website for the manufacturer of the guns, Your Honor. Well, I'm going to look at it. I ask you to look at it. I have it in my hands. I saw it on the website. 9mm rifle, MIG-14, Luger, right-hand twist, exactly matches the characteristics of the mystery gun that they say. Which was at the state crime lab, the MIG-14, and compared the projectiles and casings and concluded that the MIG-14 did not fire those exhibits. So if she had explored that with the witness, it would have exploded in her face. So by just raising the possibility that there was a second weapon that was being the MIG-14, she was trying to create reasonable doubt. As far as I know, she never made any reference to the MIG-14 and never examined the ballistics. She talked about another weapon. Another weapon. Right. Right, another weapon. My point is the mystery weapon might well be. Why do I say that? The officer himself called it a Luger, not me. The officer of first care called it a Luger MIG-14. We weren't privileged to those police reports, Your Honor. We only saw this in the record at the trial. We asked for the police reports, which the prosecution refused to give me. I talked to Wynne Horst about it. He wouldn't give me the original police reports. So we believe there's reasonable doubt about this gun. It's never been examined by defense experts. That's for sure. I must move on because you need to understand. We believe she failed to, in pretrial negotiations, Mary Lou Schanger, failed to offer up Judith Watkins as a cooperating witness against the co-defendant, Sherrod Roundtree, when he began cooperating with police from the day he was arrested, showed them where the gun was, and never, ever did she suggest that he could be a witness against Roundtree. No, she sat on her hands while the other counsel offered up his claim as a witness against Judith Watkins. And that's what prevailed in this trial. Now, the examination of the physical evidence never took place until two days before the trial. There's no excuse for a trial lawyer in a first-degree murder shooting case not examining the evidence until the weekend prior to the trial. She had six months to either compel the discovery, but she simply did not do that. She sat there and did not know what the ballistics evidence was. At trial, the trial transcripts indicate that she had no idea what the ballistics evidence was. She was surprised to find that there were two guns involved. This shows clearly that she never examined it. And she certainly didn't make any attempt to have an expert ballistics person examine these ballistic testimonies for the defense. She made no effort whatsoever. Now, the state called 21 witnesses. She subpoenaed no witnesses for Judith Watkins, even though there were credible character witnesses that testified at the motion hearings for him. And she had subpoenaed no witnesses, period. There was one witness that testified, and it was Judith Watkins, an unprepared young man not knowing what he was facing. And he had to try to explain why there was evidence of two guns. And Christy McCormick and Sherrod Ramsey said he had the other gun. So he couldn't explain that. But the examination of the physical evidence never came from Mary Lou Shaner, the trial counsel. Now, she didn't subpoena any witnesses. She didn't call any credibility-bolstering character witnesses so that there was no way that we should believe Judith Watkins' testimony. And the failure of the trial counsel to do that is inexcusable. Now, if you look at the four deer, this is the next issue we raise. She used four of seven peremptory challenges in selecting the jury, even though about nine of the jurors knew the witnesses were police officers, were familiar with the evidence. And one of the most egregious things is the McDaniel. McDaniel is the guy who became the foreman on the jury. Now, McDaniel. I have one question for you about McDaniel. Is there any further testimony or knowledge about why McDaniel was at the courthouse that day? No. She didn't ask him why. So there was no question whatsoever about what McDaniel was doing at the courthouse, talking to the dead woman's grandfather that he knew as a friend and saw as a bereaved grandfather. This McDaniel fella ran a restaurant there in town. He knew all of the people. He knew all of the officers. And he had actually talked with the grandfather of the dead woman. Not only that, but Wes Edwards played into this game. He was a customer, and McDaniel knew him. Ms. Shannon challenged him for cause. Judge Foster denied her challenge for cause. At that point, she had seven peremptory challenges left. She didn't use the peremptory challenge to get rid of McDaniel. McDaniel became the foreman of the jury. She had seven left? Yes. No, no. Three, probably. At the end. But when they were selecting him, she had all seven. When they selected McDaniel, she had seven challenges. That's correct. And no trial lawyer went to solve and let that happen. A challenge for cause. Seven peremptory challenges were left over. And she didn't use them. At this point, Mr. Christensen, I'm going to have to ask you to state the rest of your remarks for rebuttal. Okay. I knew I wouldn't have enough time. Yes. Thank you. Ms. McCormick. Your Honors Counsel, I'd like to remind the Court that what we're here in is a post-conviction proceeding. The defendant filed a post-conviction petition below. Part of it, the parts that were alleged ineffective assistance of counsel, were denied without or dismissed without an evidentiary hearing. The defendant also raised a free-standing claim of innocence supported by Sherrod Browntree's affidavit. He got an evidentiary hearing on that. And the Court denied it after an evidentiary hearing. At that proceeding, Sherrod Browntree took the fifth. But he also admitted that he repudiated that affidavit. And that letter of repudiation, which was sent to the State's Attorney, is State's Exhibit 1. Now, on appeal, it's salient to note that the defendant does not raise his free-standing claim of innocence, does not raise that, as an issue before this Court. Therefore, it is waived, Supreme Court Rule 341H7. And also, since it is not an issue that he's raised on appeal, any reference to that affidavit and to that free-standing claim of innocence is improper. And I'm asking this Court to strike that from the defendant's counsel's argument on appeal. Also, in his recitation of facts, defense counsel presently talks about Wes Edwards being a drug dealer. His convictions for any drug-related activities were barred by the Court. So that is not in evidence before this Court. It's not in the record. So I ask the Court to strike that as well. There's also no evidence that Jewel Nelson dealt in guns and drugs, or dope, as he put it. So since that's not supported, that shouldn't be considered as well. So I'll continue with the issues that the defendant does raise before this Court on appeal. And those concern issues of ineffective assistance of counsel. The first one is that counsel did not examine the evidence and didn't have it tested. Now, the record shows something different. She just didn't sit on her hands. She was quite well aware of what discovery was and what was still lacking and what she was still expecting to get on August 23rd. She was supported on June 3rd, 2004. A little over two months later, on August 23rd, at a pre-trial hearing, she indicates to the Court she's gotten a large amount of discovery materials, but she still hasn't received all the forensic materials yet. And notes the State hasn't gotten it either. November 1st, which is the bail reduction hearing, again, notes that the State Crime Lab is slow in getting this evidence processed and that she might not get it until January 2005. Did she ever request it? Yes, she did. A defense firearms expert? No, I don't believe so. I don't believe so. But anyway, she did file motions for discovery, particularly concerning physical evidence. And on January 13th, both the Defense Counsel and the State informed the Court that the physical evidence was still being held by the State Police Crime Lab and that they probably would not get the evidence in for her to view until the week of January 24th. When was the trial? It was the weekend after January 29th, 2005. Early February. First week of February is when it began. Anyway, the evidence was, including the 9mm Lorsen weapon handgun that was discovered by police and the defendant helped find it, it was in fact returned on January 21st, but Defense Counsel wasn't given the information that had been returned to the State's Attorney's Office for her examination until January 27th. And at that point, two days later, as soon as she possibly could, she examined the evidence. So there's no indication in the record of deficient performance. And also, I mean, she's done what she can as soon as she can, when she can get it. The defendant says, well, she never even contemplated having any of this evidence tested, but that's a fair allegation. And the defense on appeal does not even suggest what evidence should have been tested and just assumes prejudice. But that's his burden. The burden now is to show deficient performance and prejudice and can't show either on this allegation. So did she know that this Mini-14 was at the crime lab and had the opportunity to compare the projectiles and the casing? She did. She did. Because it was in the forensics report that she got, yes. And she knew that that Mini-14 that belonged to Wes Edwards that was covered in blood and found on his kitchen table was not, it could not have fired the, well, there were two types of projectiles fired. One casing and one projectile was identified as being fired from the 9mm Lorsen that Sherrod Roundtree carried and confessed that he fired when he shot Wes Edwards in the leg. And it confirmed, I mean, the forensics confirmed that there was only one shot fired from that weapon that was found at the scene. All the other projectiles were fired from a 9mm Luger style and it had totally different characteristics. All the other ones had characteristics that were the same, but they could not have been fired from the Lorsen. And the forensics report showed counsel that it could not have been fired from the Mini-14 rifle that belonged to Wes Edwards. So she knew all three of those things and that most of the projectiles had been fired from a weapon that was unknown. They never found it. They never knew which one it was. However, they did know this, that the defendant admitted that he had fired a 9mm Luger, a handgun, outside of Joel Nelson's house. And they did recover projectiles, I mean casings, sorry, from outside that door. And they were consistent, the characteristics were consistent with the other projectiles found at the murder scene. Now, could you say they were both fired from the same weapon? No, because you don't have the weapon. But they were consistent. It was the same kind. And so it was some evidence that the defendant had a 9mm Luger, as Sherrod Ramtree and others testified. So knowing all of this, for some reason, the state didn't bring out that that 14mm, that Mini-14, could not have fired any of the projectiles, I mean, could not have, yeah, it could not have fired the projectiles and casings found at the scene. That was not brought out in the state's case. I don't know why. Counsel, defense counsel, capitalized on that by not bringing out that fact, but also bringing out the fact that that Mini-14 was on the table. And it left a doubt, it could have raised a doubt in the jury's mind about whether that could have been the source of the gun that fired the other projectiles. Just by not bringing it out, not bringing out the fact that the Mini-14 couldn't have fired, she left it open for the jury's speculation. And that was strategy and tactics, and it was sound. Because, in fact, the jury did send out a note during deliberations asking what weapons were found at the West Edwards residence, and they answered just the Mini-14. So it did raise a doubt. It was successful. It made the jury have pause. They overcame it and convicted him for other good reasons, which we'll get into later. So for that reason, you know, hiring her own ballistics. Because, you know, she was satisfied. The Lorsen fired the one shot, and the other is a mystery gun, and she took advantage of the mystery, the unknown. Then as far as her advocacy during jury selection, well, she was not just sitting on her hands. She was active. She asked lots of questions. She exercised four peremptories. She exercised several challenges for pause, and she was successful with four of them. But she wasn't successful with McDaniel. That's true. But the court made that pause. Now, the purpose of voir dire is to assure the selection of an impartial jury. Now, none of the voir dire shows anything but what the jurors that were shown agreed that the burden of proof was on the state, agreed that there was a presumption of incense, agreed that they would follow the law as instructed. They all agreed that those that knew policemen or were related to them agreed that they wouldn't credit a policeman's testimony just because he was a policeman. They agreed that they would, if they had heard anything about the case, that they would be willing to put it aside and judge the case by the evidence presented. So there's nothing to show in the record that there was not an impartial jury picked. And there wasn't any affidavit of a juror supporting the defendant's post-conviction petition to show otherwise. So we're left with what's on the record to judge, and this is what the court did below, to judge what counsel should have done or shouldn't have done. She challenged McDaniel for cause and was denied that. Yes, it was denied. She had no peremptory? She did have peremptories left at that point. But looking at it, I mean, there's no case out there saying that counsel's ineffective if they don't exercise 100% of their peremptories. She didn't exercise this on this man, but she did at the same time exercise it on three others that she found more objectionable. I can't remember which panel group he was in, McDaniel's. Did she have all of them left when he appeared? He was on that first panel that I believe. He was in that first panel, and the others that she exercised some peremptories on were in that first panel. And she did have peremptories left. Yes, she did. So what kind of strategy is it if you challenge a juror for a cause and you're denied it and you don't want that juror and you don't use a peremptory? Especially when the juror says, and there's a quote in here, that he's going to have trouble putting some of this aside, as I recall. We'll get that later in the record, but it was very troubling when I read that. He was trying to be very honest about it. I mean, he was an alderman and he was a retired restaurant owner. He knew everybody in a passing manner. Isn't that why you wouldn't want him on your jury, precisely? But on the other hand, you know, he said he would try to put aside any knowledge. He said, although he had talked to, like, Wes Edwards and to the grandfather, he said they didn't talk about the case. Although he knew the policeman, he hadn't talked about the case. Although he knew the state's attorney and defense counsel, he had not talked about the case with any of them. The bottom line is it was the court found that he could not be challenged for cause. I mean, or denied the challenge for cause. The court found, by looking at him, that he could be fair and impartial, a fair and impartial jury. And the salient point is at this point in time, at post-conviction, it's the defendant's burden to show that there was actual prejudice and that he couldn't do that, and he never did it. He doesn't have an affidavit of McDaniel. And there's nothing in the record that shows that he could not have been impartial. Perhaps, you know, he might, you know, other defense counsel would have, you know, exercised a peremptory. But this was early in the game, and she didn't know how many more that she might have to use that peremptory on. And this fellow seemed less objectionable than the two that she exercised peremptories on at that point. So, you know, it's how can you define how many peremptories you're going to have to use? And this man seemed less objectionable. And she did believe his answer, that he could be fair and unbiased, and that he answered the questions truthfully. But the bottom line is, you know, whether that was a mistake in tactics or not, mistakes in tactics themselves don't prove up ineffective assistance of counsel. And particularly at this point, it doesn't show that he was deprived of any right because he can't show any prejudice, and he doesn't have McDaniel's affidavit. This is all speculation. And you can't grant a post-conviction petition on the basis of speculation. The court below did not, and this court shouldn't either. In any event, for all of the complaints that appellate counsel makes on his post-conviction proceeding that he makes about what counsel should have asked various potential jurors, it turns out, in fact, those questions were asked either by the prosecution or by the judge. So why should she have reiterated questions that she already knew the answer to? That's not an effective assistance of counsel. But this court can look at that. I won't be tedious and go through each and every one of them except to say that because I would like to get on to the cross-examination of witnesses. Now, he claims that counsel was ineffective because she didn't cross-examine Christie McCormick or Sherry Roundtree or the forensic specialist in certain ways. But the record will show that she did impeach McCormick's credibility. She showed her a photograph of her closet, which was People's Exhibit 46, after she denied knowing that that weapon was in her closet. And it's absolutely, totally pristine, tidy. And if anything had been in there and been out of place, it would have been obvious. So she impeached her with that. She impeached her with the fact that at the time the planning of this robbery was going on, she didn't call the police. She elicited that even though when she knew that crime had been committed and they called, you know, Sherry Roundtree called with the cell phone, she didn't call 911 even though she knew people might have been injured. She didn't go to the police the next morning either. But the police came to her. And when they came, she didn't tell the whole truth because it came out during cross-examination. She was trying to protect her son and trying to protect Jobel Nelson. So contrary to the post-conviction claim, she did effectively impeach Christine McCormick. As far as Sherry Roundtree, it was the fact that he had pled guilty and that he had not been sentenced yet and they had something to gain was there, was there before the jury. But counsel went on and elicited that Sherry Roundtree was a very close friend with Jobel Nelson and this was impeaching in itself and that he had partied at Wes Edwards' house and that, yes, in fact, he was a friend of Wes Edwards'. So she also elicited that Sherry Roundtree, although he did turn himself in to police, didn't do so until after he knew that he was being sought and that he didn't tell the whole truth the first time to the police either. She also tendered IPI 3.17, which is the instruction that requires a jury to view Roundtree's testimony with suspicion since he was an accomplice witness. The other thing is that counsel did not cross-examine about the lack of the defendant's present fingerprints on the duct tape or the duct tape roll. Well, the testimony never showed the defendant was in any proximity to that, I mean, that he ever touched the duct tape. There's no testimony that he did. In fact, Sherry Roundtree said he was the one who was dealing with the duct tape and trying to bind Wes Edwards up. And so the testimony, I mean, there was already testimony establishing that the defendant didn't touch the duct tape because Sherry Roundtree always did. So why go into an absence of the defendant's fingerprints on the duct tape? It was already established. And then as far as cross-examining the forensics specialist, the firearms specialist, about the Mini-14, we've already gone into that. Why counsel not bringing out the fact that the forensic specialist had tested the Mini-14? Anyway, I'm going to ask you to affirm the testimony. Thank you, Mr. McCormick. Mr. Chris, the rebuttal. Thank you, Your Honor. I will simply say that the collection of ineffective maneuvers by Ms. Mary Lou Shaner resulted in ineffective assistance of counsel at the trial level. No pretrial negotiations for a young kid with no criminal record, a high school student with A and B grades, and wanting to go to college. She was perfect for the cooperating witness against Sherrod Roundtree. However, that didn't happen. She didn't examine the physical evidence, no matter how you want to excuse it, and the ballistics evidence was never taken out of the sealed paper bags, ever. They still haven't been out of those sealed paper bags that they were put in to begin with. Nobody looked at the physical evidence. There were no witnesses subpoenaed by Mary Lou Shaner. During the fourth year, as we've talked about, she let McDaniel get on the jury. He was a foreman. William McDaniel is an alderman for the city of Metropolis, a retired businessman operating a barbecue place. His nephew, Nick Grissy, is a Massac County police officer. One of the investigators in the case was Investigator Rich Griffey, who was his brother-in-law for over 20 years. McDaniel informed the court that he knew all the city police officers and all the county officers. He also informed the court that he knew several people on the witness list. In addition to personally knowing eight witnesses for the state, Detectives Mike Kennedy, Inspector Dean Hamilton, Special Agent Chad Brown, Rance Juice, Michael Tyson, Danny Thomas, Mr. McDaniel was personal friends with Mike Helton, another investigator. He knew the surviving victim, Wes Edwards. The most troublesome acquaintance, of course, was his personal acquaintance with Mr. Evans, the grandfather of the murder victim, Andrea Perdue. Mr. McDaniel informed the court that he had a conversation with Mr. Evans at the courthouse prior to trial. He described him as a bereaved grandfather. Ms. Shaner failed to ask Mr. McDaniel a single question concerning the extent of his personal acquaintance with the murder victim's grandfather. But she knew he shouldn't have been on the jury because she challenged him for cause. And with seven preliminary challenges left, she let him go on the jury. With that kind of bias and prejudice, it's pretty obvious that this guy should not have been the foreman of this jury. That is ineffective assistance to counsel in and of itself. She didn't conduct meaningful cross-examinations. And she had inane remarks to make. This woman was not prepared to go to trial in this murder case. Period. She didn't examine it. She called no witnesses. She had no theory of the defense. The defendant was left without trial counsel. But what we haven't talked about is his ineffective assistance on appellate counsel. E. Joyce Randolph was appointed to be the appellate counsel. And a timely notice of appeal was filed, and she was appointed. She filed no brief whatsoever. She didn't use the Collins standard, challenging it was not proof beyond a reasonable doubt that this young man had personally discharged the weapon that killed Andrea Perdue, for which he died an extra 25 years. She waived those issues by not filing any brief whatsoever in the appellate court. It's ludicrous to say that this is a lawyer doing his or her job. An appellate lawyer is supposed to file an appellate brief, particularly in a murder case. And we see what happened here. E. Joyce Randolph filed a motion three weeks after the brief was due for summary relief. And what was the summary relief? They miscalculated the days that Judah Watkinson spent in jail prior to trial as 3-14, and it should have been one more day. So the appellate counsel in this case, E. Joyce Randolph, got my client one day off of a 50-year sentence. Instead of raising the reasonable doubt questions under the Collins standard, instead of raising the effective assistance of counsel of her buddy, Mary Lou Shaner, she didn't raise any issues. She waived all of the issues on direct appeal for my client. And it was left with me in the post-conviction phase. So we claim that E. Joyce Randolph failed to give effective assistance to counsel when she failed to file any brief whatsoever. And she uses that as an excuse for filing that motion three weeks late. Other pressing matters. We believe that other pressing matters kept her from reading the trial record, kept her from thinking about what she might do when this young man wrongfully incarcerated for a murder he had nothing to do with. No, she said on her hands, there was no brief whatsoever filed in this court on behalf of Judah Watkinson on direct appeal. That's absolutely intolerable for any of us. And clearly, the Strickland standard applies here. Yes, there's prejudice. Yes, this is not counsel envisioned by the Sixth Amendment. E. Joyce Randolph was ineffective at the appellate level, and the 10-team encumbrance between Mary Lou Shaner at the trial level and nothing happening at the appellate level wrongly convicted this young man. Now, I ask you to read my 49-page brief carefully, whichever one of you has got this, and I ask you to remand this case for a new trial. Let me go there. Let me try this case. Thank you. Thank you, Mr. Christensen. Thank you, Ms. McCormick. And we will take this matter under advisement or under ruling in due course. Thank you all. This court is adjourned.